Robert WALKER, Plaintiff–Appellant,

v.

L. BATES, Hearing Officer, Defendant–Appellee.

No. 731, Docket 93–2107.

United States Court of Appeals, Second Circuit.

Argued Dec. 15, 1993.

Decided April 29, 1994.

Mitchel H. Ochs, New York City (Richard L. Klein, Willkie Farr & Gallagher, of counsel), for plaintiff-appellant.

Martin Hotvet, Asst. Atty. Gen., Albany (Robert Abrams, Atty. Gen. of the State of New York, New York City, of counsel), for defendant-appellee.

Before: FEINBERG, MINER and MAHONEY, Circuit Judges.

MINER, Circuit Judge:

## I.

Plaintiff-appellant Robert Walker appeals from a judgment entered in the United States District Court for the Western District of New York (Larimer, *J.*) dismissing

his complaint against defendant-appellee L. Bates, a Tier III Hearing Officer at the Southport Correctional Facility ("Facility") where Walker is an inmate. In the complaint, grounded in the provisions of 42 U.S.C. § 1983, Walker alleged that his constitutional procedural due process rights were violated in the course of a disciplinary hearing that resulted in a decision to confine him to the Special Housing Unit ("SHU") at the Facility. The district court concluded that reversal of the disciplinary hearing decision on administrative appeal cured any procedural defects in the hearing and dismissed the complaint pursuant to the provisions of Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. We reverse.

## II.

On December 5, 1990, during the course of his confinement at the Facility, a prison maintained by the New York State Department of Correctional Services, Walker was issued an "Inmate Misbehavior Report" by Corrections Officer P. Youmans. In the Misbehavior Report Walker was charged with violation of an institutional rule prohibiting the possession of contraband in the form of a weapon and violation of another institutional rule prohibiting the possession of state bedding in excess of authorized issue. According to Youmans, the weapon was a metal rod. approximately 9½ inches long, and the excess bedding consisted of an extra pillow, two extra pillow cases and two extra sheets. The items allegedly were discovered by Youmans "while doing a routine cell frisk" of Walker's cell. Walker denied the charges, contending that he had just moved into the cell and that the items found by Youmans belonged to the prior occupant.

A Tier III disciplinary hearing was convened by Hearing Officer Bates on December 10, 1990 to consider the violations alleged in the Misbehavior Report. In the New York Prison System, Tier III disciplinary hearings, also known as Superintendent's hearings, are used for the review of the most serious violations of institutional rules. *See* N.Y.Comp.Codes R. & Regs. tit. 7, § 270.3 (1989). Walker entered a plea of not guilty at the hearing and requested that three witnesses be called: Corrections Officer Youmans, the officer who wrote the Misbehavior Report; Gallery Officer Quarnek, who was in charge of the gallery area when the items were found; and Sergeant Zarnecki, who was assigned duties related to inmate housing at the time of the incident. Bates summarily refused the requests, proceeded with the hearing, found Walker guilty of both violations and imposed a sentence of confinement for 120 days in the SHU. Walker began serving that sentence on December 10.

## III.

Walker administratively appealed Bates' decision to Donald Selsky, Director of Special Housing/Inmate Discipline for the Department of Correctional Services. In a notice dated February 11, 1991, Selsky reversed the decision of Bates "as of February 8, 1991," expunged Walker's disciplinary record and authorized a rehearing "within 7 days of the notice." Although no rehearing was held within the prescribed seven-day period, Walker was not released from SHU until February 22, 1991.

On February 28, 1991, Walker filed his pro se complaint in an action to recover damages pursuant to 42 U.S.C. § 1983 for due process deprivation. In the complaint Walker named Bates, Superintendent Robert McClellan and Commissioner Thomas Coughlin as defendants. The complaint later was amended to reflect the dismissal of Coughlin and McClellan as parties. Walker alleges that he improperly was denied his right to call witnesses at the hearing and that the testimony of the witnesses would have corroborated his defense and altered the outcome of the hearing. Damages are sought for the entire period of his detention in SHU. On September 21, 1992, Bates moved for dismissal pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, arguing that the administrative appeal cured any procedural defect in the hearing.

In a Report and Recommendation dated October 9, 1992, Magistrate Judge Fisher recommended to the district court that the motion to dismiss be denied. The Magistrate Judge concluded that Bates' refusal to permit Walker to call witnesses and Walker's

subsequent confinement in the SHU stated a claim under section 1983. The Magistrate Judge further concluded that the administrative reversal did not cure the defective hearing.

By Decision and Order dated January 5, 1992, the District Judge rejected the Report and Recommendation of Magistrate Judge Fisher. The District Judge concluded that, based on his ruling in *Sowell v. Ryan*, 823 F.Supp. 107 (W.D.N.Y.1992), *aff'd without opinion*, 996 F.2d 302 (2d Cir.1993), decided subsequent to the filing of the Magistrate Judge's Report and Recommendation, the administrative reversal cured any constitutional improprieties in the hearing and dismissed the complaint with prejudice. Walker timely appealed to this Court.

## IV.

According to regulations promulgated by the New York Department of Correctional Services,

[a] *special housing unit (SHU)*, in maximum security facilities as well as in designated medium security facilities, shall consist of single-occupancy cells grouped so as to provide separation from the general population, and may be used to house inmates confined to such units pursuant to Part 301 of this Title as well as such other inmates as approved by the commissioner or his designee.

N.Y.Comp.Codes R. & Regs. tit. 7, § 300.2 (1991). The regulations require SHU inmates to "be housed in an area designed to maximize facility safety and security." *Id.* § 300.1(b). Confinement in the SHU is a form of solitary imprisonment. In addition to being separated from the general prison population, SHU inmates are limited in the prison issue items and personal belongings they may possess. *Id.* § 302.2. Also limited are shower and exercise privileges. *McCann v. Coughlin*, 698 F.2d 112, 117 n. 5 (2d Cir. 1983).

Admissions to the SHU are governed by Part 301 of the Regulations of the Department of Correctional Services. Part 301 provides for disciplinary admissions in consequence of the "[d]isposition of superintendent's (Tier III) hearing for a designated period of time as specified by the hearing officer (7 NYCRR 254.7)." N.Y.Comp.Codes R. & Regs. tit. 7, § 301.2(a) (1991) (Section 254.7 provides a range of penalties that may be imposed by a hearing officer). Part 301 also empowers the prison authorities to admit inmates to the SHU for purposes of detention, *id.* § 301.3, administrative segregation, *id.* § 301.4, protective custody, *id.* § 301.5, keeplock for reasons such as confinement to await disposition of a disciplinary hearing, *id.* § 301.6(a) and other purposes approved by the Deputy Commissioner for Facility Operations, *id.* § 301.7.

■ The disciplinary hearing procedure requires that the Misbehavior Report be served on the inmate at least 24 hours before the hearing, *id.* § 253.6(a), and that the inmate be provided with an assistant to help him prepare for the hearing, *id.* § 253.4. The inmate must be present at the hearing unless he refuses to attend or his exclusion is warranted for reasons related to institutional safety or correctional goals. *Id.* § 253.6(b). The hearing must be recorded electronically, *id.* and the inmate, if present, is entitled to make oral or written statements and to submit documentary evidence, *id.* § 253.6(c). The regulations provide that

[t]he inmate may call witnesses on his behalf provided their testimony is material, is not redundant, and doing so does not jeopardize institutional safety or correctional goals. If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented.

*Id.* § 253.5(a). Where there are adequate reasons to exclude a witness from the hearing, the statement of the witness may be tape recorded and made available to the inmate at the hearing. *Id.* § 253.5(b). Before the hearing, the inmate may address his request for witnesses either to the person appointed to represent him or to the hearing officer; a request for witnesses may also be addressed to the hearing officer at the hearing. *Id.* §§ 253.5(c)(1), (2).

The procedures established by the New York regulations comport with the due process procedural rights in disciplinary proceedings to which prison inmates are entitled. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). "When restrictive confinement within a prison is expressly imposed as a disciplinary sanction ... there will ordinarily be no doubt that the confinement impaired a liberty interest protected by state law and that the due process procedures specified in *Wolff* are therefore required." *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984) (footnote omitted); *see also McCann,* 698 F.2d at 121–22 ("[A]n inmate who is or may be sentenced to a term of confinement in a Special Housing Unit has a right to the procedural protections of the Due Process Clause," including the right to call witnesses in his defense.). The denial of an inmate's right to call witnesses under circumstances such as those revealed here, constitutes, without more, a compensable constitutional due process violation. *See Patterson v. Coughlin,* 761 F.2d 886, 893 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). The only issue presented in this case is whether the administrative appeals procedure provided by the New York regulatory scheme cured the violation. Walker exercised his right to appeal to the Commissioner of Corrections, and the Commissioner's designee, the Director of Special Housing/Inmate Discipline, reversed the hearing disposition and ordered a new hearing. *See* N.Y.Comp.Codes R. & Regs. tit. 7, § 254.8(d) (1993). That hearing never was held, and Walker was discharged on February 22, 1991 after having been confined in the SHU since December 10, 1990, the date the penalty was imposed.

### V.

In a case factually on all fours with this one, the Supreme Court held that members of a federal prison discipline committee established to hear and determine cases in which inmates are charged with infractions of prison rules are entitled to qualified, rather than absolute, immunity for constitutional violations in the conduct of the hearings. *See Cleavinger v. Saxner,* 474 U.S. 193, 206, 106 S.Ct. 496, 503, 88 L.Ed.2d 507 (1985). The inmates in *Cleavinger* were found guilty of encouraging other inmates to engage in work stoppages and of other charges. One inmate was not allowed to call witnesses at the disciplinary hearing, and one was not allowed to cross-examine his accusers. The committee imposed upon each inmate the punishment of segregated detention and forfeiture of "good time." By administrative appeals to the Warden and to the Regional Director of the Federal Bureau of Prisons, they succeeded in being released from detention and having all records of their alleged misbehavior expunged. Their actions against the discipline committee members to recover damages and for other relief was tried to a jury, which awarded damages on finding that the Fifth Amendment due process rights of the inmates had been violated. The Seventh Circuit Court of Appeals affirmed, rejecting the defendants' contention that they were entitled to absolute immunity as members of the discipline committee. *See Saxner v. Benson,* 727 F.2d 669 (7th Cir.1984).

Rejecting the government's claim of absolute immunity in these circumstances, the Supreme Court in *Cleavinger* concluded that qualified immunity provided sufficient protection for those called upon to adjudicate in the prison setting. The Court stated:

> All the committee members need to do is to follow the clear and simple constitutional requirements of Wolff v. McDonnell, supra; they then should have no reason to fear substantial harassment and liability. Qualified immunity has been widely imposed on executive officials who possess greater responsibilities.

*Cleavinger,* 474 U.S. at 207, 106 S.Ct. at 503–504.

Then Associate Justice Rehnquist in dissent argued for a finding of absolute immunity in cases in which the administrative appeals process permits vindication of prisoners' claims:

> If in fact the administrative system set up by the government offers administrative relief from these officials' mistakes and thereby permits the vindication of constitutional claims in this manner, I believe that

the grant of absolute immunity meets the conditions set out in *Butz v. Economou.*[1] *Id.* at 211, 106 S.Ct. at 506 (Rehnquist, J., dissenting). The majority, of course, saw it differently, making a clear distinction between those who are entitled to absolute immunity in the administrative process and those who are not. Prison disciplinary committee members, according to the majority,

> are not professional hearing officers, as are administrative law judges.... They are employees of the Bureau of Prisons and they are the direct subordinates of the warden who reviews their decision. They work with the fellow employee who lodges the charge against the inmate upon whom they sit in judgment. The credibility determination they make often is one between a co-worker and an inmate.... It is the old situational problem of the relationship between the keeper and the kept, a relationship that hardly is conducive to a truly adjudicatory performance.

*Id.* at 203–04, 106 S.Ct. at 501–02. Although the Court did not deal directly with the question of whether the successful administrative appeal constituted a bar to the recovery of section 1983 damages, it let the damages judgment stand without comment, apparently satisfied that qualified immunity provided the members of the discipline committee with sufficient protection from suit, regardless of the outcome of the administrative appeal.

## VI.

In an opinion that was filed seven months before the *Cleavinger* decision was announced, we determined that New York prison officials who placed an inmate in isolated confinement for prison rule infractions without complying with New York law or with *Wolff's* due process requirements were subject to a claim for damages for constitutional deprivations, despite the availability of administrative appeal and of later state court remedies. *See Patterson,* 761 F.2d at 893. Although the administrative appeal was unsuccessful, an Article 78 proceeding instituted in the New York Supreme Court resulted in an Order of Stipulation dismissing the inmate's claim with prejudice but ordering his release, the restoration of his good time and the expungement from his record of any reference to the disciplinary proceeding. *Id.* at 889. In that case, as in this, the state failed to follow its own rules, which conformed to the requirements of *Wolff.*

We held in *Patterson* that a hearing is required before punishment may be imposed and that "a post-deprivation hearing, by way of an Article 78 proceeding or an action for damages in the Court of Claims, is inadequate, by definition, to meet the requirements of due process." *Id.* at 893. Particularly illuminating for the purpose of resolving the case now before us is this statement: "Once a cause of action for a constitutional violation accrues, nothing that the state does subsequently can cut off the § 1983 action." *Id.* The constitutional violation, in that case and this, obviously occurred when the penalty was imposed in violation of state law and due process requirements. Administrative appeal, whether successful or not, cannot cut off the cause of action any more than can a proceeding brought in the state courts to vacate the penalty imposed and vindicate the prisoner's rights.

We revisited this issue in *Young v. Hoffman,* 970 F.2d 1154 (2d Cir.1992) (per curiam), *cert. denied,* — U.S. ——, 114 S.Ct. 115, 126 L.Ed.2d 80 (1993), a case in which the District Judge had granted summary judgment and awarded nominal damages of $1.00 to a New York prison inmate who was deprived of his right to call witnesses at a disciplinary hearing. The District Judge also predicated the grant of summary judgment on the deprivation of the plaintiff's right to be present at the hearing and his right to have an impartial hearing officer in his Tier III disciplinary hearing. We reversed, because the Director of Special Housing/Inmate Discipline of the Department of Correctional Services reversed the hearing disposition *before* the inmate began to serve his SHU confinement sentence: "[T]he penalty and

---

**1.** 438 U.S. 478, 513, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978) (holding inter alia that the role of an administrative law judge within a federal administrative agency is so "functionally comparable" to that of a judge as to entitle him to absolute immunity)

recommended loss of good time were vacated and the records of the hearing were expunged. Young never served a day of the penalty." *Id.* at 1155. Accordingly, we determined that Young "suffered no interference with a liberty interest and ha[d] no valid claim for relief." *Id.* at 1156. In the case presently before us, the appellant had served a substantial portion of his disciplinary sentence before he was released. Indeed, he was not released from his confinement until some time after his penalty was vacated and all charges against him were dismissed.

In our most recent pronouncement on the subject of the due process rights of prisoners in the disciplinary context, "[w]e d[id] not reach the question of whether due process is violated by the imposition of punishment pending an appeal that redresses any error in the earlier proceeding." *Russell v. Scully,* 15 F.3d 219 (2d Cir.1994). In *Russell,* the inmate claimed that the Hearing Officer, Captain Wright, did not properly examine into the credibility of certain confidential informants at the time of the hearing in 1989. It appeared that the Hearing Officer did make some inquiry independent of the assessment made by a prison employee witness. We determined that "[i]t was not clearly established in 1989 (and is not now) that the procedure followed by Captain Wright constituted a constitutionally inadequate independent examination of credibility." *Id.* at 223. Accordingly, we concluded that Wright was protected by qualified immunity and entitled to summary judgment for that reason.

It was clear to us in *Russell* that the inmate

would not have been released from the SHU pending the appeal even had Captain Wright not begun the designated punishment. Confinement in the SHU would thus have continued whether or not the punishment began, and Russell thus did not suffer a constitutional harm by the confinement during the appeal period.

*Id.* at 222. In the present case, it is clear that Walker was confined *only* for punishment purposes and there is no indication in the record here that he would have been confined in the SHU for any other reason

had his punishment not begun. We earlier took note of the various regulations of the New York Prison System governing confinement in the SHU. Those regulations provide a number of reasons, other than sentence to a disciplinary term, for which inmates may be admitted to the SHU. For example, the regulations provide for confinement to await disposition of a disciplinary action. *See* N.Y.Comp.Codes R. & Regs. tit. 7, § 301.6(a) (1990). None of those reasons formed the basis for Walker's special confinement. He began to serve his disciplinary sentence immediately after his hearing, as ordered, and continued his confinement in the SHU on that sentence until he was released.

While it is true, as we observed in *Russell,* that many appellants in the federal criminal system are serving their sentences when their convictions are reversed and have no due process damages claims by virtue of constitutional error at their trials, it now seems to us that the difference is a function of the different types of immunity afforded to those who impose sentence. For a number of good reasons delineated in its opinions, the Supreme Court has decreed that those who perform purely judicial functions are entitled to absolute immunity, *see, e.g., Stump v. Sparkman,* 435 U.S. 349, 359, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331 (1978) (state judge); *Butz v. Economou,* 438 U.S. 478, 513, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978) (administrative law judge), while those who adjudicate disciplinary hearings in prisons are entitled to qualified immunity only, *see Cleavinger,* 474 U.S. at 206, 106 S.Ct. at 503. It is this qualified immunity, rather than the proposed fiction that the administrative appeals process provided for prisoners is a continuation of the disciplinary hearing and provides all the due process necessary, to which prison officials must look for their protection. The dissent in *Cleavinger* would confer absolute immunity upon prison officials where an administrative appellate process is provided. That is not the rule.

The rule is that once prison officials deprive an inmate of his constitutional procedural rights at a disciplinary hearing and the prisoner commences to serve a punitive sentence imposed at the conclusion of the hear-

ing, the prison official responsible for the due process deprivation must respond in damages, absent the successful interposition of a qualified immunity defense. In the case before us, the Hearing Officer denied a request for witnesses without any finding that their testimony would be immaterial or redundant or that institutional safety or correctional goals would be jeopardized by their presence. There may have been some good reason for this summary denial of the inmate's request, but it is not apparent on the face of the record before us. The issue of qualified immunity can be addressed by the district court on remand. We hold only that Walker's success in the administrative appeal process does not bar his section 1983 claim and that his complaint states a claim for relief.

## VII.

The judgment of the district court is reversed, and the case is remanded for further proceeding consistent with the foregoing.

MAHONEY, Circuit Judge, dissenting:

I respectfully dissent.

The majority invokes *Cleavinger v. Saxner*, 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), and *Patterson v. Coughlin*, 761 F.2d 886 (2d Cir.1985), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986), as calling for reversal in this case. I disagree with that assessment.

*Cleavinger* concededly dealt with a factual setting that is comparable to this appeal, in that a prisoner was awarded damages for unlawful confinement pursuant to a disciplinary ruling that was reversed by an internal prison administrative appeal, and the defendants were the prison authorities who rendered the initial disciplinary ruling. The Court explicitly stated, however, that: "The sole question raised by petitioners in this Court is whether, as committee members, they were entitled to absolute immunity. Petitioners state that they have not challenged—although they do not concede—the ruling that they violated 'clearly established rights' of respondents." 474 U.S. at 199 n. 5, 106 S.Ct. at 499 n. 5.

It is accordingly clear that the issue that must be decided on this appeal was never presented to, or considered by, the Court in *Cleavinger*. It is thus pure speculation to attribute to the *Cleavinger* Court, as the majority does, "apparent[ ] satisf[action] that qualified immunity provided the members of the discipline committee with sufficient protection from suit, regardless of the outcome of the administrative appeal." That speculation does not invest *Cleavinger* with any precedential significance for the resolution of an issue that *Cleavinger* never addressed.

Similarly, *Patterson* should not be deemed to control decision here. As the majority recognizes, the prisoner in *Patterson* was unsuccessful in his administrative appeal, but prevailed in an independent proceeding in state court. We held that "an Article 78 proceeding or an action for damages in the Court of Claims" would not cure an administrative denial of due process, commenting that: "Once a cause of action for a constitutional violation accrues, nothing that the state does subsequently can cut off the § 1983 claim." 761 F.2d at 893. Once again, *Patterson* simply does not address the question whether a "constitutional violation accrues" at all when there is an adverse disciplinary ruling that is reversed by the appellate operation of the prison's internal administrative process.

I agree with the majority that both *Russell v. Scully*, 15 F.3d 219 (2d Cir.1994), and *Young v. Hoffman*, 970 F.2d 1154 (2d Cir. 1992) (per curiam), *cert. denied*, —— U.S. ——, 114 S.Ct. 115, 126 L.Ed.2d 80 (1993), are distinguishable, because in *Russell* our holding was premised upon qualified immunity, *see* 15 F.3d at 223–24, and in *Young* the prisoner never commenced service of his disciplinary sentence. *See* 970 F.2d at 1155. I note, however, that the primary basis of the ruling in *Young* was the administrative correction of the violative disciplinary determination, while the fact that the prisoner never commenced his sentence was adverted to "[i]n addition" in a concluding paragraph. *See id.* at 1156. Nonetheless, we are presented with an issue as to which, in my view, there is no controlling Supreme Court or Second Circuit precedent.

I would resolve the issue by ruling that there is no procedural due process violation that gives rise to a § 1983 action when a prison disciplinary determination that violates constitutional standards is rectified by a timely internal administrative appeal. Bates' appeal brief points out that in 1992 alone there were 20,097 Tier III hearings in the New York prison system, and 5,588 reviews resulting in 4,291 affirmances, 620 modifications, 590 reversals, and 87 decisions in non-disciplinary categories. It seems to me neither workable nor constitutionally required, in this context, to posit a § 1983 violation whenever there is *any* disciplinary detention, however limited, after a constitutionally infirm hearing that is subsequently rectified by an internal administrative appeal.

The constitutional rights of prison inmates are legitimately curtailed as a result of their convictions for criminal offenses. *See Hewitt v. Helms*, 459 U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983); *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). Especially given the difficulties inherent in prison administration, a rule that encourages careful oversight of disciplinary proceedings at the internal appellate level strikes the appropriate balance. *See Young*, 970 F.2d at 1156 ("We believe that, as a policy matter, th[e] possibility of cure through the administrative appeals process will encourage prison administrators to correct errors as an alternative to forcing inmates to seek relief in state or federal courts.") (citing *Harper v. Lee*, 938 F.2d 104, 105 (8th Cir.1991) (per curiam)). If no appellate process is made available, or if its operation is inordinately delayed while a prisoner is confined as a result of a disciplinary determination, a § 1983 remedy would then be available.[1] *Cf. Wright v. Smith*, 21 F.3d 496, 499–500 (2d Cir.1994) (affirming prisoner's liberty interest in not being confined for extended period without a hearing); *Lowrance v. Achtyl*, 20 F.3d 529, 536 (2d Cir. 1994) (due process requires opportunity to be heard within reasonable time after imposition of keeplock).

I would accordingly affirm the judgment of the district court.

---

1. It could be argued that some portion of the 77-day sentence to punitive confinement that Walker served in this case, eleven days of which occurred after the administrative reversal of the determination which imposed that sentence, resulted from inordinate delay. It seems pointless to pursue the issue in this dissent, however, in view of the majority's ruling that a § 1983 claim arises when a prisoner "commences to serve a punitive sentence" imposed as the result of a constitutionally defective hearing.