Mario CAMPO, Plaintiff,

v.

John P. KEANE, Superintendent, J. Pico, Civilian, Sing Sing Correctional Facility, Defendants.

No. 93 Civ. 3946 (LBS).

United States District Court, S.D. New York.

Feb. 6, 1996.

Mario Campo, plaintiff, pro se.

Dennis C. Vacco, Attorney General, New York City, (Marion R. Buchbinder, Assistant Attorney General, of counsel), for defendants.

## OPINION

SAND, District Judge.

Plaintiff Mario Campo, *pro se*, brings this action pursuant to 42 U.S.C. § 1983 against Superintendent John P. Keane, Corrections Officer Jose Pico, and the Sing Sing Correctional Facility. Plaintiff alleges a violation of his procedural due process rights during a prison disciplinary hearing. Defendants move for summary judgment.[1] For the reasons set forth below, the Court grants defendants' motion with respect to all claims.

### I.

### BACKGROUND

Plaintiff Mario Campo ("Campo") is an inmate incarcerated in the Sing Sing Correctional Facility. On July 31, 1992, Corrections Officer Burgess filed an Inmate Misbehavior Report (the "Report") against plaintiff. The Report charged plaintiff with a violation of facility rule 113.10, which prohibits the possession of a weapon.

According to this Report, Ex. A to Buchbinder Affidavit dated November 11, 1993, plaintiff concealed a homemade weapon beneath a plate of potatoes while he was on his food delivery rounds. Plaintiff was strip searched, and no other weapons were found.

---

1. Originally, defendants moved for a motion to dismiss pursuant to Rule 12(b)(6). By Order dated November 12, 1993, this Court converted that motion into a motion for summary judgment.

Thereafter, plaintiff was handcuffed and escorted to the Special Housing Unit ("SHU") to await a hearing on the charge.

On August 4, 1992, defendant Hearing Officer Jose Pico ("Pico") commenced a Tier III disciplinary hearing to consider the alleged weapons violation. At the hearing, Campo contended that he was framed by an inmate named Walls who had planted the contraband on the tray and who had then told the officers to conduct the frisk. Hearing Transcript, Ex. A to Buchbinder Aff. Dated Dec. 20, 1993 ("Tr.") at 9. In order to prove his contention, plaintiff initially requested the testimony of six witnesses. Campo stated, however, that he did not wish to call inmate Walls as a witness. He later waived his original request to call as a witness another inmate, Manos. *Id.* at 7, 8, 10.

As the hearing progressed, on three separate occasions plaintiff requested additional witnesses. *Id.* at 19, 29–30, and 36. Defendant Pico allowed the testimony of all the requested witnesses except one, Officer Pundt ("Pundt"). Hearing Record Sheet, Ex. A to Buchbinder Aff. Dated Dec. 27, 1994. Defendant Pico explained that he denied plaintiff's request to call Pundt because Pundt lacked personal knowledge of the events surrounding the alleged disciplinary violation, and any testimony he could offer on related matters would be redundant. *Id.* at 60.

During the hearing, plaintiff also requested to speak to, or for defendant Pico to interview, the officers' confidential informants. *Id.* at 31–32. Their testimony was sought concerning the frisk. Pico assured plaintiff that he was "dealing with the confidential sources." *Id.* Pico later stated, however, that he had no access to confidential information. *Id.* at 64.

On August 18, 1992, after the completion of all testimony, defendant Pico found plaintiff guilty of the charged violation. Pico based his disposition on the conclusion that plaintiff had lacked authorization to be on the cell block where he had been stopped with the food tray and that Campo's unauthorized presence itself constituted more than probable cause to conduct the frisk. *Id.* Campo, however, disputed this justification, maintaining that as a food server, he had "access to the entire institution." *Id.* at 61. Pico imposed a penalty of 365 days in the SHU, inclusive of the time already served. In addition, he suspended plaintiff's package, commissary, and telephone privileges and imposed a disciplinary surcharge of five dollars on plaintiff's account. *Id.* at 63.

That same day, August 18, plaintiff appealed Pico's decision to the Commissioner of the Department of Correctional Services Thomas Coughlin (not a defendant herein). On September 22, 1992, after a discretionary review, defendant Superintendent John Keane ("Keane") reversed Pico's ruling. Keane determined that the contraband had been planted on the plaintiff, who was completely unaware of its presence. Ex. to Pl.Aff. Dated December 14, 1993. According to plaintiff, he was not removed from the SHU until September 29, 1992; Campo's time in the SHU thus totalled 61 days.[2] Pl.Aff. Dated Sept. 25, 1995, at 1.

Plaintiff now brings this action pursuant to 42 U.S.C. § 1983 alleging that his procedural due process rights were violated during the August 1992 disciplinary hearing. In particular, Campo alleges that defendant Pico violated his rights by refusing to call witnesses requested by plaintiff, by denying plaintiff access to information received from confidential informants, and by failing to conduct the hearing in an impartial manner. Complaint ¶ 4. Plaintiff alleges that defendant Keane was grossly negligent in his supervision of defendant Pico.[3]

---

**2.** While the exact duration of plaintiff's confinement in the SHU is unclear, the Court will accept plaintiff's longest estimate for the purpose of this summary judgment proceeding.

**3.** Defendants originally moved to dismiss the Complaint on the primary ground that any procedural defects that may have occurred during the August 1992 hearing were cured by defen-

dant Keane's reversal of defendant Pico's decision. Def.Memorandum Dated Nov. 12, 1993. Defendants now concede that this argument fails in light of the Court of Appeals decision in *Walker v. Bates*, 23 F.3d 652, 658–659 (2d Cir.1994) (holding that reversal on administrative appeal does not bar an action for damages stemming from a due process violation that occurred at a prisoner's disciplinary hearing where the prison-

## II.

## DISCUSSION

### A. Standard for Summary Judgment

■ Summary judgment is appropriate where the moving papers and affidavits submitted by the parties "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court's role is not to resolve disputed factual issues, but rather to determine whether the record, taken as a whole, supports any issues that require a trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Used properly, Rule 56 is a "vital procedural tool to avoid wasteful trials," *Capital Imaging v. Mohawk Valley Medical Assocs.*, 996 F.2d 537, 542 (2d Cir.1993), and "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2553.

■ The court must view the evidence in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 26 (2d Cir.1988). Where, as in this case, a plaintiff submits the complaint *pro se*, the complaint must be liberally construed. *See Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972); *Platsky v. CIA*, 953 F.2d 26, 28 (2d Cir.1991). Thus the allegations found in Campo's complaint, " 'however inartfully pleaded,' are held 'to less stringent standards than formal pleadings drafted by lawyers.' " *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980) (quoting *Haines*, 404 U.S. at 520, 92 S.Ct. at 595).

■ The moving party bears the initial burden of establishing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). However, if the non-moving party would bear the burden of proof on a claim at trial—as plain-

tiff would in this case—the moving party may satisfy its burden by demonstrating an absence of evidence to support an essential element of the claim. *Id.* at 325, 106 S.Ct. at 2554. To defeat the motion, the non-moving party must "do more than show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356, but instead must point to evidence sufficient to establish each element of its case, *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552—evidence, that is, such that a reasonable jury could return a verdict for the non-moving party on that element. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir.1992), *cert. denied*, 508 U.S. 909, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993).

### B. Legal Standard for Liability under 42 U.S.C. § 1983

■ When Congress passed 42 U.S.C. § 1983, it created a civil cause of action against any person who, acting pursuant to state government authority or under the color of state law, abridges rights secured by the United States Constitution or by federal law. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924, 102 S.Ct. 2744, 2747, 73 L.Ed.2d 482 (1982). In order to prevail on a claim under § 1983, a plaintiff must prove that the defendant(s): (1) acted; (2) "under color of state law;" and (3) in a manner that deprived the plaintiff of "any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. *See Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986).

It is unquestioned that the authorized actions of defendants Pico and Keane, both employees of the New York state prison system, arise under color of state law. Therefore, the question in this case is whether the defendants acted in a manner that

er has suffered punishment, such as restrictive confinement, as a result of the initial administrative determination). *Accord Mays v. Mahoney*,

23 F.3d 660, 662 (2d Cir.1994). Def.Supplemental Memorandum Dated July 7, 1994 at 10.

deprived plaintiff Campo of any rights, privileges, or immunities secured by the Constitution.

### C. The Protected Liberty Interest under Sandin

██ Before evaluating plaintiff's claims regarding defendants' conduct at the disciplinary hearing, the Court must first determine whether or not Campo has asserted a violation of a protected liberty interest. If Campo was not deprived of a protected liberty interest, his cause of action must be dismissed whether or not defendants failed to conduct his disciplinary hearing in accordance with required procedures.

In a recent case that reexamined how state prison regulations can create protected liberty interests, the Supreme Court held that while states may create liberty interests protected by the Due Process Clause, such state-created liberties are generally limited to:

> freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nevertheless impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Sandin v. Conner*, —— U.S. ——, ——, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995) (citations omitted). In so holding, the Supreme Court reaffirmed a longstanding principle that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974).

The inmate plaintiff in *Sandin* alleged a violation of due process under 42 U.S.C. § 1983. The alleged violation occurred at a hearing where plaintiff was sentenced to thirty-day disciplinary segregation in the Special Holding Unit of a Hawaii prison for "high misconduct." *Sandin*, —— U.S. at ——, 115 S.Ct. at 2296. The Supreme Court found that the thirty-day segregation sentence was "within the range of confinement to be normally expected for one serving a indeterminate term of 30 years to life" in a maximum security prison, and, therefore, was not an "atypical and significant deprivation in which a state might conceivably create a liberty interest." *Id.* at ——, 115 S.Ct. at 2301. In so holding, the Court relied on the record's showing that:

> disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody ... [t]hus [plaintiff's] confinement did not exceed similar, but totally discretionary confinement in either duration or degree. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing [prisoner] there for 30 days did not work a major disruption in his environment.

*Id.*

*Sandin* may be read as "calling into question the continuing viability of our [Second Circuit] cases holding that New York regulations afford inmates a liberty interest in remaining free from administrative segregation." *Rodriguez v. Phillips*, 66 F.3d 470, 479 (2nd Cir.1995). The *Rodriguez* opinion did not elaborate on this point however, and the Second Circuit has yet to discuss the *Sandin* decision in the context of disciplinary segregation.[4]

Prior to the *Sandin* decision, the Second Circuit recognized that when "restrictive confinement within a prison is expressly imposed as a disciplinary sanction ... there will ordinarily be no doubt that the confinement impaired a liberty interest protected by state law and that the due process procedures specified in *Wolff* are therefore required." *Sher v. Coughlin*, 739 F.2d 77, 81 (2d Cir.1984) (citations omitted), *affirmed in* *Walker v. Bates*, 23 F.3d 652, 656 (2d Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995). The Second Circuit has also recognized that where an inmate served a substantial portion of a disci-

---

4. The Court of Appeals did not proceed with a further analysis of *Sandin* in *Rodriguez* because it concluded that even assuming the existence of a liberty interest, "it was objectively reasonable for [defendant] to believe that [plaintiff] had received all the process he was due." *Rodriguez*, 66 F.3d at 480.

plinary sentence in the SHU before a successful appeal, such sentence constitutes compensable deprivation of a liberty interest. *Walker,* 23 F.3d at 656 (citing *Patterson v. Coughlin,* 761 F.2d 886, 893 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986)); *see also McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1982) ("[A]n inmate who is or may be sentenced to a term of confinement in a Special Housing Unit has a right to the procedural protections of the Due Process Clause," including the right to call witnesses in his defense).

In evaluating whether or not plaintiff Campo, who spent 61 days of disciplinary confinement in the SHU, suffered an atypical and significant hardship in comparison to the usual expectations of prison life at the Sing Sing Correctional Facility, this Court is faced with the difficult task of determining the extent to which the Supreme Court's decision in *Sandin* has overturned the longstanding Second Circuit rule that any imposition of disciplinary confinement requires constitutional due process protections. In light of *Sandin,* we must assess the disruption suffered by Campo in comparison with the environment faced by prisoners who are not subject to disciplinary segregation. *Sandin,* —— U.S. at ——, 115 S.Ct. at 2301.

The Second Circuit has previously characterized confinement in the SHU as a form of solitary confinement. *Walker,* 23 F.3d at 655. "In addition to being separated from the general prison population, SHU inmates are limited in the prison issue items and personal belongings they may possess. Also limited are shower and exercise privileges." *Id.* (citations omitted). Plaintiff argues that conditions for Sing Sing inmates confined to the SHU are much worse than those faced by the general population because they are denied important privileges. Specifically, plaintiff notes that while in the SHU: 1) he was allowed only one visit per week, instead of five; 2) he was unable to make any commissary purchases or receive packages, which resulted in his losing weight; 3) he was denied all access to the law library; 4) he was unable to attend classes; and 5) he missed the opportunity to enroll in the fall

semester of college. Pl.Memorandum Dated August 2, 1995, ¶¶ 4–5.

Plaintiff also argues that he suffered particularly egregious hardship as a result of his confinement to the SHU. Plaintiff contends that he lost his job as a diet cook as a result of the entire incident. *Id.* ¶ 3. More importantly, he alleges that he was prohibited from using the telephone while confined in the SHU, and as a consequence, he lost contact with his daughter during the time after her mother's death when she was almost placed in foster care. *Id.* ¶ 4. This allegedly resulted in "permanent damage" to the relationship between plaintiff and his daughter. *Id.* ¶ 6. Finally, plaintiff claims that his inability to use the telephone prevented him from retrieving certain valuables from brother's apartment. *Id.* ¶ 7.

Under New York prison regulations, inmates can be placed in the SHU for disciplinary confinement, administrative reasons, protective custody, or as keeplock confinement. 7 N.Y.C.R.R. §§ 301.2–301.6. Defendants argue that plaintiff's confinement to the SHU does not constitute an "atypical and significant" deprivation of liberty under *Sandin* because the conditions imposed upon New York inmates confined to the SHU for disciplinary reasons are identical to those imposed on inmates who are confined to the SHU for administrative reasons. Def.Memorandum Dated August 21, 1995, at 6. Furthermore, defendants argue that the difference between conditions for SHU inmates and those of the general population is no greater than the difference that *Sandin* held insufficient to create a protected liberty interest. *Id.* at 7. In support of this position, defendants have produced a convincing affidavit from the Deputy Commissioner and Counsel for the New York State Department of Correctional Services that highlights the great amount of discretion given to the Superintendent of each facility regarding the confinement of inmates. Affidavit of Mr. Annuncio, Dated August 16, 1995 at 3.

Nevertheless, this case can be distinguished from *Sandin* because plaintiff Campo faced a more serious charge and a more serious potential sentence than did Sandin. In *Sandin,* the plaintiff received the maxi-

mum possible sentence, thirty days in punitive segregation, for an offense of "high" as opposed to "greatest" misconduct. *Sandin,* —— U.S. at —— n. 1, 115 S.Ct. at 2296 n. 1. In contrast, Campo was sentenced to 365 days in the SHU (of which he served 61) at a Tier III disciplinary hearing, which is "used for the review of the most serious violations of institutional rules." *Walker,* 23 F.3d at 654. This distinction is of great importance in light of the recognized Second Circuit principle that due process rights must be determined with respect to the *potential* penalty. *McKinnon v. Patterson,* 568 F.2d 930, 939 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978).

Because the Court of Appeals has yet to speak clearly on the impact of *Sandin* in this Circuit, and because summary judgment can be granted in this case on more solid precedent by assessing the issue of a *violation* of due process, this Court believes it more prudent not to rule on the *Sandin* issue directly. *See Moore v. Selsky,* 900 F.Supp. 670, 673 (S.D.N.Y.1995).[5] We proceed on the assumption that *Sandin* does not bar from consideration allegations raising questions of material fact as to the *deprivation* of due process rights.

**D.** *Due Process Violations*

1. Defendant Pico

Plaintiff alleges that defendant Pico violated his procedural due process rights under the Fourteenth Amendment during the August 1992 disciplinary hearing. In particular, plaintiff claims that defendant Pico improperly refused to call witnesses requested by plaintiff, failed to examine confidential informants who were potential witnesses, denied plaintiff access to information received from confidential informants, and failed to conduct the disciplinary hearing in an impartial manner.

a. Failure to Call Witnesses

Although a New York inmate has a due process right to call witnesses, under N.Y.C.R.R. § 254.5(b), courts have held that this right is not absolute. *See Ponte v. Real,* 471 U.S. 491, 495, 105 S.Ct. 2192, 2195, 85 L.Ed.2d 553 (1985); *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979 (1974). A prisoner's right to call witnesses is available only "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979. Prison officials must be accorded the discretion necessary to keep a hearing within reasonable limits and to refuse to call witnesses when summoning them may create a risk of reprisal or undermine authority. *Id.* A hearing officer may also refuse to call a witness "on the basis of irrelevance or lack of necessity." *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991); *see also Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979; *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992).

While a prison official must at some point explain the reasons for refusing to allow a prisoner to call a witness at a disciplinary hearing, that explanation need not be in writing, and need not be detailed.

[P]rison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify, but that they may do so either by making the explanation part of the "administrative record" in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a "liberty" interest is challenged because of a claimed defect in the hearing. In other words, the prison officials may

---

**5.** The Southern District courts that have addressed the meaning of an "atypical and significant hardship" under *Sandin* have, not surprisingly, differed in their view of the extent of the Supreme Court's holding. *See, e.g., Bishop v. Keane,* 1995 WL 384443 at *4 n. 4 (S.D.N.Y. June 28, 1995) (whether 87 days confinement in keeplock imposes atypical and significant hardship raises questions of fact that cannot be addressed in a summary judgment motion); *Lee v. Coughlin,* 902 F.Supp. 424 (S.D.N.Y.1995) (1 year in segregation is an atypical hardship under *San-* *din*); *Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995) (implying that *Sandin* bars any § 1983 suit for prisoner who suffered keeplock confinement); and *Zamakshari v. Dvoskin,* 899 F.Supp. 1097 (S.D.N.Y.1995) (60 days in SHU is not an atypical hardship under *Sandin* ). Several circuit courts have remanded cases for more extensive fact finding before determining what constitutes "atypical and significant hardship" under *Sandin. See, e.g., Gotcher v. Wood,* 66 F.3d 1097 (9th Cir.1995); *Whitford v. Boglino,* 63 F.3d 527, 532 (7th Cir.1995).

choose to explain their decision at the hearing, or they may choose to explain it "later."

*Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196.[6]

■ Campo alleges that defendant Pico violated his due process rights by failing to call certain requested witnesses at the August 1992 disciplinary hearing. The Hearing Record Sheet, signed by plaintiff, indicates that the only requested witness whose testimony was denied was Corrections Officer Pundt. Ex. A to Buchbinder Aff. Dated Dec. 27, 1994.[7] Plaintiff sought Officer Pundt's testimony because Pundt normally worked the entrance to the cell block where plaintiff was apprehended, and he had searched plaintiff several times in the two weeks prior to the alleged disciplinary violation. Tr. at 36–37. Campo believed that Officer Pundt's testimony would have demonstrated both that the inmates who were trying to frame him had been dropping notes on him for some time preceding the alleged violation and that Campo would never have risked carrying contraband as he had already been subjected to repeated searches on the cell blocks. *Id.* at 36.

Defendant Pico denied plaintiff's request on the ground that Officer Pundt's testimony would be irrelevant and redundant. *Id.* at 60. Defendant Pico explained that Officer Pundt was not working in the facility on the day that the alleged infraction occurred and therefore had no personal knowledge of the events surrounding the frisk. *Id.* In addition, the fact that other officers had already testified that plaintiff had been subject to prior searches rendered any further testimony by Officer Pundt on this point unnecessary. *Id.*

Defendant Pico's treatment of Officer Pundt satisfied the dictates of both the Supreme Court in *Wolff* and *Ponte* and the Second Circuit in *Kingsley* and *Scott.* Defendant Pico acted within his discretion when he deemed that Officer Pundt's testimony would be irrelevant, and plaintiff has not offered the Court any cause to doubt the reasoning behind his decision. Pico explained his decision in the appropriate form by presenting plaintiff with a written explanation of his refusal to call Officer Pundt, thereby meeting the due process requirements of both N.Y.C.R.R. § 254.5 and *Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196. For these reasons, we find that defendant's failure to call Pundt constituted neither an abuse of discretion nor a constitutional violation.

■ While Officer Pundt was the only witness whom defendant Pico refused to hear, plaintiff was dissatisfied with defendant Pico's questioning of a second witness, inmate Albert Alleyen, also known as Prince ("Alleyen"). Defendant Pico explained to plaintiff that because prison rules prohibit any interaction between an inmate confined to the SHU and other prisoners, inmate Alleyen could not be questioned in plaintiff's presence. Tr. at 25, 46 and 58. Plaintiff had instructed defendant Pico to ask inmate Alleyen if he had seen inmate Walls hand Campo a feed-up tray just before the alleged disciplinary incident. *Id.* at 35–36. When defendant Pico asked this question, inmate Alleyen answered that "Wall didn't pass him [plaintiff] no tray." *Id.* at 42. When plaintiff heard the playback of defendant Pico's question and Alleyen's response, he protested and argued that Alleyen had misunderstood his question. *Id.* at 45–6, 57–8. As a result of his dissatisfaction with the treatment of inmate Alleyen, plaintiff refused to sign the form prepared by Pico regarding his testimony. *Id.* at 59; Ex. to Pl.Aff. Dated Dec. 14, 1993.

---

6. N.Y.C.R.R. § 254.5 states that if permission to call a witness is denied to an inmate, a "hearing officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented."

7. Defendant Pico refers in the transcript to an Officer Farm, rather than Officer Pundt, as the witness whose testimony was denied. Tr. at 60.

Defendants have asserted that Officer Pundt and Officer Farm are the same person, Defendants' Supplemental Memorandum Dated July 7, 1994 at 7, and plaintiff has not responded to the contrary. Because the Hearing Record Sheet signed by the plaintiff states that the only witness who was denied was Officer Pundt, we will accept this explanation.

Defendant Pico's questioning of inmate Alleyen did not constitute a constitutional violation when viewed under the standards of *Wolff, Ponte, Kingsley,* and *Scott,* discussed *supra.* Pico asked Alleyen the question exactly as plaintiff had requested. There is no evidence that defendant attempted to obfuscate the question, and he cannot be held culpable if Alleyen did indeed misunderstand him. When defendant Pico offered to pose another question to inmate Alleyen, plaintiff requested that the identical question be asked again. Tr. at 57–58. It was perfectly reasonable for defendant Pico to refuse to do so. Therefore, plaintiff's complaint regarding the questioning of Inmate Alleyen does not amount to a viable claim.

b. Failure to Interview Confidential Informants

■ Plaintiff's second allegation is that defendant Pico violated his right to procedural due process by failing to interview the confidential sources as had been requested. For the following reasons we find that even if defendant Pico did violate plaintiff's due process rights in this regard, Pico is entitled to qualified immunity and can not be held liable for such a violation.

At the very beginning of the hearing, plaintiff contended that he had been framed by an inmate named Walls. *Id.* at 9. However, when defendant Pico asked if he wanted to call Walls as a witness, plaintiff responded that he did not, stating, "if he set me up do you think he's going to admit it?" *Id.* at 10. Also at the beginning of the hearing, Campo waived his right to call an inmate named Manos. *Id.* at 8. Approximately halfway through the hearing, after six witnesses had been called, Pico asked Campo to confirm that he had waived his right to call Manos. *Id.* at 36. The following conversation then ensued:

Pico: Alright so let me adjourn here. Now the other people are Manos, This man you waived right?

Campo: Alright. Well I waived him but I also want you to have the opportunity to, I want to ask for that you speak or we can confront, through the speakerphone or whatever, their confidential sources.

Pico: Excuse me?

Campo: I want to speak, interview that person, cause I know that's not within the hearing procedure. But whatever procedure it is in dealing with the confidential sources.

Pico: I'm dealing with the confidential sources.

Campo: You're going to deal with the confidential sources?

Pico: I am dealing with it.

Campo: Okay.

Pico: That doesn't answer my question. I just want to

Campo: Oh, Sorry.

Pico: Trying to see if I could take care of witnesses. So this Manos you waived, you told me?

Campo: Yeah. I waived him but, you know, even though

Pico: Is that a yes or a no?

Campo: Yes I waived him previously. But when I get to see the confidential

Pico: My question to you is how many witnesses you want more?

Campo: I want the confidential sources. I can't do that?

Pico: The confidential sources, the hearing officer is dealing with them. I'm asking you. You told me Sgt. Dezayas, Sgt. Kerrigan, Lt. McElroy, Lt. McGovern. Who else do you want as a witness? That is my question?

Campo: That's it sir.

Pico: Okay. So Manos you waived. How about Prince?

Campo: Prince I still want.

Pico: Alright so that's another one.

Campo: Oh, okay, I'm sorry. Prince and Mr. Newkirk.

Pico: Newkirk

Campo: Right.

Pico: Okay so that's six more witnesses right?

824

Campo: Yes sir.

Pico: And that'll do it.

*Id.* at 31–32.

At the conclusion of the hearing plaintiff signed the requisite form indicating that he had indeed waived his initial request to call Manos, Ex. to Pl.Aff.Dated Dec. 14, 1993. Nevertheless, as the excerpts from the hearing transcript indicate, he was somewhat encouraged to do so by defendant Pico who seemed exasperated by the continual addition of witnesses.[8] The record also indicates that defendant Pico twice assured plaintiff that he was "dealing with the confidential sources." While it is not explicitly clear that Pico intended to call the confidential informants, it is clear that plaintiff requested that he speak to them. In his summary statement at the end of the hearing, plaintiff reiterated his desire to have defendant Pico interview the confidential informants, who he claimed were no longer confidential "because I'm putting them on the record ..." Tr. at 62. Plaintiff now argues that while it is true that he originally did not intend to call inmate Walls, "the confidential source," he was left with no choice after over a dozen witnesses had testified. Pl.Aff.Dated July 8, 1994, ¶¶ 11, 13, 14, 16.

Pico contends that under *Russell v. Scully,* 15 F.3d 219 (2d Cir.1993) (as modified on rehearing), plaintiff was not entitled to hear the testimony of confidential informants nor to have defendant Pico interview those informants, even if their testimony were relevant. Def.Supplemental Memorandum Dated July 7, 1994, at 12. Defendant further contends that "[t]he reliability of the informants in the instant case was attested to by Lt. Finn and Sgt. Leghorn." *Id.* at 12–13.

In addition to arguing that due process was satisfied by an independent assessment of the reliability of the confidential source, defendant Pico also claims that he is entitled to the defense of qualified immunity. Pico argues that it was not clear in 1992, and it is not clear now, whether due process requires a more elaborate assessment of a confidential source's credibility than the one he made. *Id.* at 12 n. 5.

■ The doctrine of qualified immunity provides that "government officials performing discretionary functions ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Summary judgment is "particularly appropriate when the qualified immunity defense is based on a showing that the asserted right was not clearly established." *Rodriguez,* 66 F.3d at 475. Summary judgment is also available when "even though plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the action complained of, it was nonetheless 'objectively reasonable' for the defendant official 'to believe that his acts did not violate those rights.'" *Id.* (quoting *Robison v. Via,* 821 F.2d 913, 921 (2d Cir. 1987)).

■ In *Russell,* the Second Circuit held that "[n]either due process nor applicable precedent compels that a hearing officer ... conduct personal interviews of confidential informants." *Russell,* 15 F.3d at 223. The court found that while some assessment of the credibility of a confidential witness is required, exactly what method or procedure is constitutionally required is not clear. *Id.* at 223. According to *Russell,* therefore, a prison hearing officer who evaluates an informant's credibility enjoys qualified immunity from a suit alleging that the officer's failure to adequately to assess a confidential informant violated an inmate's due process. *Id.* at 224.[9]

---

**8.** Plaintiff contends that Manos was immediately transferred out of the Sing Sing facility upon the reversal of Campo's disciplinary conviction. Pl.Aff.Dated Feb. 24, 1995, at ¶ 10.

**9.** "Even if there is a due process right to an independent assessment of informants' credibility ... that right would not entail more than some

examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility. *[However, b]ecause it was not clearly established at the time of the hearing—or now—that the procedure [the hearing officer used] was inadequate, [that hearing officer], as a government official, is protected by*

In the instant case, by questioning both Lt. Finn and Sgt. Leghorn about the reliability of the informants, defendant Pico satisfied the *Russell* requirement that he in some manner assess the credibility of the confidential informants. Lt. Finn testified that he had authorized the frisk because Sgt. Leghorn had received a confidential note that Campo was carrying weapons and drugs on his person and in feed-up trays. In addition, Lt. Finn stated that the confidential note came from a person who had provided Sgt. Leghorn with reliable confidential information in the past. Tr. pp. 14–16. Sgt. Leghorn corroborated Lt. Finn's testimony: "the source we had relied upon had been reliable before." *Id.* p. 23. While it is troubling that Defendant Pico seemingly misled plaintiff into believing that he would interview any confidential informants, there is no evidence that he did so deliberately. By questioning Lt. Finn and Sgt. Leghorn, defendant Pico fulfilled what he reasonably believed to be his obligation to assess the credibility of the confidential sources. He is therefore protected by the doctrine of qualified immunity and entitled to a grant of summary judgment on this claim.

### c. Fair and Impartial Hearing Officer

Campo also argues that he was deprived of the due process protection of a fair and impartial hearing officer. *See Patterson v. Coughlin*, 905 F.2d 564, 569 (2d Cir.1990) ("An inmate subject to a disciplinary hearing is entitled to, *inter alia*, an impartial hearing officer."); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"); *McCann v. Coughlin*, 698 F.2d 112, 122 (2d Cir.1983).

Plaintiff's allegation is based on defendant Pico's refusal to interview Officer Pundt and personally to assess the credibility of the confidential informants. As discussed above, however, neither of these actions by defendant Pico violated plaintiff's constitutionally protected due process rights. Therefore, they evidence no partiality on the part of Pico.

There is no evidence in the record to support any inference that Pico's factual findings were biased or that defendant had prejudged the case before it was heard. Neither is there evidence to support an inference that Pico's findings were arbitrary and capricious or the result of an abuse of discretion. *See Superintendent v. Hill*, 472 U.S. 445, 457, 105 S.Ct. 2768, 2775, 86 L.Ed.2d 356 (1985).[10] Defendant Pico's findings were "supported by some evidence in the record," *Hill*, 472 U.S. at 454, 105 S.Ct. at 2773, namely, the testimony regarding the reliability of the confidential informants and Sgt. Leghorn's statement that plaintiff's mere presence in a block without authorization was reason enough to conduct the frisk. Tr. at 24. The Court therefore grants defendant's motion for summary judgment on this claim.

### 2. Defendant Keane

Plaintiff argues that defendant Superintendent Keane should be held liable for any due process violations arising out of the disciplinary hearing because of Keane's gross negligence in supervising Pico's conduct during that hearing. Pl.Aff.Dated Dec. 14, 1993 at 7. Defendant Keane asserts that he is entitled to summary judgment because he had no personal involvement in any alleged due process violation.[11] Def.Supple-

---

*qualified immunity." Russell*, 15 F.3d at 223 (emphasis added).

10. In *Hill*, the Supreme Court held that "due process ... requires only that there be some evidence to support the findings made in [a prison] disciplinary hearing.... Although the evidence in this case might be characterized as meager ... the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary." *Hill*, 472 U.S. at 457, 105 S.Ct. at 2775.

11. "A defendant may be personally involved in a constitutional deprivation within the meaning of

42 U.S.C. § 1983 in several ways. The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event." *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

mental Memorandum Dated July 7, 1994 at 14. Because we find that no constitutional violations occurred at the hearing, we grant defendant Keane's motion for summary judgment without the need to address the issue of his involvement.

## III.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted in its entirety.

SO ORDERED.